UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

RD 11/21/19
AMH.

★ NOV 2 1 2019 ★

BROOKLYN OFFICE

UNITED STATES OF AMERICA

– against –

JAVIEL FORD,

          Defendant.

**MEMORANDUM AND ORDER**

19-CR-81

**Parties:**

For United States

For Defendant

**Appearances:**

Andrew Grubin
Assistant United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201-1820
718-254-6322

Douglas G. Morris
Federal Defenders of New York, Inc.
One Pierrepoint Plaza, 16th Floor
Brooklyn, NY 11201
718-330-1209



**JACK B. WEINSTEIN, Senior United States District Judge:**

## Table of Contents

I. Introduction .................................................................................................................. 1

II. Facts ........................................................................................................................... 1

III. Law .......................................................................................................................... 4

IV. Application of Law to Facts ..................................................................................... 5

V. Conclusion ................................................................................................................. 6

### I. Introduction

Defendant moves to suppress a handgun and ammunition recovered from him, along with statements made by him subsequent to the recovery. Stopped, seized, and searched in an apartment complex parking lot during the early hours of a Sunday morning in January 2019, he argues that it was too dark for police officers to have seen the gun he had in the waistband of his jeans as it slid down his pants leg and, thus, that they did not have the requisite reasonable suspicion to stop and pat him down. Defendant's subsequent statements should be suppressed, he contends, as fruits of the poisonous tree.

An evidentiary hearing was conducted on July 22, 2019 and July 24, 2019. Two of the three police officers present at the January 2019 event testified. Among other evidence admitted, the court viewed a video recording of the incident in question, observed and held the sizeable gun, and saw the jeans Defendant was wearing. Though the court has concerns about the credibility of the police officers, the totality of the evidence requires the conclusion that they had reasonable suspicion to stop and patdown search Defendant. Defendant's motion to suppress is denied.

### II. Facts

On January 13, 2019, New York City Police Department ("NYPD") Sergeant Robert Barnett and Detectives Bennett Shelley and John Antoniades were driving in an unmarked car in

1

the 60th Precinct, near West 24th Street and Neptune Avenue in Brooklyn, New York. Evid. Hr'g Tr. 6:6–19, 8:7–21, 9:4–9.

Detectives Shelley and Antoniades, who testified at the evidentiary hearing, are experienced NYPD officers. Detective Shelley has been with the NYPD for about 11 years and has participated in approximately 100 gun arrests. *Id.* 6:14–15, 7:8–14. He was promoted to detective from police officer about two years ago. *Id.* 6:18–21. Detective Antoniades has worked for the NYPD for about six years; he was promoted to detective approximately one year ago. *Id.* 90:11–20. He has participated in approximately 25 gun arrests and is trained to "spot" firearms on people. *Id.* 91:16–24.

The NYPD officers are part of the Citywide Anticrime Team, a specialized unit of police personnel that focuses on combatting violent crime. *Id.* 6:20–7:17, 8:11–14, 90:21–25. Those on the Citywide Anticrime Team are sent out each week to the areas of the city that have experienced or are experiencing an increase in violent crime. *Id.* 6:24–7:5. Although crime statistics indicate that the 60th Precinct had a relatively low crime rate in January 2019, *see* Def. Ex. E-R, ECF No. 49-1, the NYPD sent officers to the 60th Precinct because of an increase in criminal activity, Evid. Hr'g Tr. 6:24–7:5, 90:21–91:12, 92:3–4.

At approximately 1:30 a.m., the officers were driving with their tinted windows down so that they could hear what was going on and see what has happening around them. *Id.* 10:1–5, 94:16–21. As they drove, they heard people yelling in a nearby parking lot; it sounded like an argument. *Id.* 9:10–25, 95:12–15. The officers drove closer to the parking lot, observed four men arguing in the center of the lot, and pulled into it. *Id.* 9:10–25, 10:12–14, 95:4–18. It seemed to the officers as though the argument might become a physical fight. *Id.* 9:17–19, 95:4–9.

When the officers drove into the lot, the group dispersed. Two of the men walked toward the exit of the parking lot, past the driver's side of the unmarked car. *Id.* 10:22–11:2, 98:15–20. The other two men, one of whom was Defendant, walked away from the officers' car, toward a parked car at the edge of the parking lot. *Id.* 10:22–11:12, 98:15–25. The two men near the parking lot exit spoke to the officers briefly, and explained that the four men were family members having an argument following their attendance at a baby shower. *Id.* 11:13–16, 99:3–9. Then, the officers pulled further into the lot. *Id.* 11:18–24, 99:12–23. As they did so, Defendant walked in front of the police car with his right side to it. *Id.* 12:2–6, 12:21–13:4, 99:21–100:5. He moved directly in front of the car in seconds, before turning left and walking away from the car. *Id.* 12:24–13:14, 99:24–100:2.

At this point, the lighting in the parking lot and Defendant's attire became critical. The lot was attached to a New York City Housing Authority apartment complex. *Id.* 10:6–8, 94:22–95:1. It was well-lit by building lights, streetlamps, and, at the time of the action in question, the headlights of the officers' car. The court observed all this in the video recording, *see* Def. Ex. A, and it is consistent with the testimony of Detectives Shelley and Antoniades, *see* Evid. Hr'g Tr. 10:15–21, 95:19–24; *id.* 96:20–24 ("THE COURT: Are the overhead lights what they appear to be? THE WITNESS: No, this video is much darker. THE COURT: It was lighter than that? THE WITNESS: It was much lighter, yes."). Defendant was wearing fairly tight denim jeans that became tighter around his ankle and a jacket that ended around his waist. Gov't Ex. 2A, ECF No. 44-3 (picture of Defendant after arrest); Gov't Ex. 2B, ECF No. 44-4 (picture of Defendant's ankle after arrest); Gov't Ex. 5 (pants recovered from Defendant).

When Defendant walked directly in front of the officers' car, he did so in a strange manner. He was kicking his right leg—which faced the car—away from his body. Evid. Hr'g

Tr. 13:15–19, 100:18–20. The officers, two sat in the front seat and the third sat in the second row of seats, observed a large bulge in Defendant's right pants leg, first slightly above his knee and then sliding down his pants before stopping around his ankle. *Id.* 8:24–9:3, 13:20–25, 94:5–6, 100:21–102:2. The bulge had the outline of the firearm, with the barrel pointed down. *Id.* 16:23–17:9, 100:25–101:2, 104:4–6.

Detectives Shelley and Antoniades exited the car and walked to Defendant. *Id.* 19:3–8. Detective Shelley gripped Defendant by the arms while Detective Antoniades felt Defendant's ankle. *Id.* 19:3–10, 104:7–14. Detective Antoniades recovered the firearm; Defendant was placed in handcuffs and put in the police car. *Id.* 19:9–10, 19:19–22, 105:2–11, 106:1–6. The gun was about one foot in length and more than two pounds in weight. *Id.* 101:7–102:2, 133:3–13. He was transported to the 60th Precinct, where he waived his rights and made a number of oral admissions. *See* Gov't Ex. 4; Gov't Ex. 4A, ECF No. 44-7 (transcript of interrogation).

### III. Law

Individuals are protected from "unreasonable searches and seizures" by the Fourth Amendment to the United States Constitution. U.S. Const. amend. IV.

Lawful searches and arrests must be made on the basis of probable cause—that "the facts and circumstances within [law enforcement officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts." *United States v. Cruz*, 834 F.2d 47, 50–51 (2d Cir. 1987).

Under *Terry v. Ohio*, "a police officer may briefly detain an individual for questioning if the officer has 'a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity.'" *United States. v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008) (quoting

*United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991)). Reasonable suspicion requires

more than an "inarticulate hunch[]." *Terry v. Ohio*, 392 U.S. 1, 22 (1968). "The suspicion must

derive from specific and articulable facts which, taken together with rational inferences from

those facts, provide detaining officers with a particularized and objective basis for suspecting

wrongdoing." *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016) (internal citation and

quotation marks omitted). In assessing the officers' justification of a stop, the court asks whether

"'the facts available to the officer at the moment of the seizure or the search warrant a person of

reasonable caution in the belief' that the action taken was appropriate." *United States v. Fiseku*,

915 F.3d 863, 870 (2d Cir. 2018) (quoting *Terry*, 392 U.S. at 21–22). "During a lawful stop, if

the investigating officer has reason to believe that the detained individual is armed and

dangerous, he may conduct a patdown search for concealed weapons." *Padilla*, 548 F.3d at 187.

Physical evidence or statements obtained as a result of an illegal stop, search, or seizure

will be excluded. *Wong Sun v. United States*, 371 U.S. 471, 484–88 (1963).

### IV. Application of Law to Facts

The circumstances of the stop, search, and seizure of Defendant demonstrate that there

was a strong reasonable suspicion to support a stop and search of Defendant, and then probable

cause to arrest him.

Defendant's main argument is that the testimony of Detectives Shelley and Antoniades is

not credible. Though the court is aware of and concerned about reports that lying is the norm for

some police officers, *see Cordero v. City of New York*, 282 F. Supp. 3d 549, 554–55 (E.D.N.Y.

2017), the video and physical evidence available in this case corroborates the detectives' reports

of their observations. Minor inconsistences of observation and memory do not diminish the

effect of the video and physical evidence.

The gun is large and Defendant's pants were relatively tight to his legs. As the gun moved down the pants leg, it would have created a large bulge. The light in the parking lot was sufficient for the officers to have seen the bulge. Defendant was walking irregularly as the bulge moved down his leg. These observations support the belief that he had a dangerous firearm sliding down his pants leg and provided the officers with reasonable suspicion to stop Defendant and search for the weapon. *See United States v. Lucas*, 68 F. App'x 265, 267 (2d Cir. 2003) (concluding that there was reasonable suspicion to stop and patdown search the defendant when the officer personally observed an object that appeared to be a firearm); *United States v. Henry*, No. 90-cr-613 (CBA), 1990 WL 179739, at *4 (E.D.N.Y. Nov. 6, 1990) (holding that a bulge observed under the defendant's sweater, his evasive behavior in an attempt to conceal the bulge, and his presence in a high crime area justified stopping him).

Because the court concludes that the officers had reasonable suspicion to stop and search Defendant for a weapon, it does not address whether the officers had probable cause from the outset of their interaction with Defendant, as the government argues. Once the officers recovered the firearm, they had probable cause to arrest Defendant. His subsequent statements to the police are not excluded because the stop, search, and seizure were lawful.

## V. Conclusion

Defendant's motion to suppress is denied. A status conference is scheduled for December 19, 2019 at 10:30 a.m. Time is excluded for speedy trial purposes through that date.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated:   November 19, 2019
         Brooklyn, New York